In the Interest of M.B.H., a minor, and I've lost my signing sheet for the union, but what's your name? Twyla Russell-Orr. All right, Ms. Orr, you may proceed. Thank you. Please, the court, counsel. As I said, my name is Twyla Russell-Orr. I practice law out of Effingham, Illinois. I am here representing Penny H. in a juvenile proceeding. It's an action out of the Fourth Judicial Circuit in Fayette County. My client, Penny, is here today. She is the biological grandmother and the adoptive mother of M.B.H., a minor. In September of 2009, DCFS took the minor child from my client and her husband. The allegation at the time was that my client's husband had struck the child in the face, causing a large bruise. There were no specific abuse allegations against my client. The allegation was basically that she neglected the child because she left the child with her husband, but there was no indication that she knew he was violent or that he had hit the child before or anything along those lines. In any event, she's continually maintained her innocence in this matter. Very strongly, she's maintained her innocence. In any event, though, the court did, the trial court adjudicated the minor child as abused and neglected, made the child a ward of the court, and established guardianship with DCFS. My appointment in the case came at that time. Penny had gone through the dispositional stage on her own without counsel. Then I was appointed. So we filed an appeal of that dispositional stage of the actual establishment of guardianship in DCFS. At the same time, or near that same time, after my appointment and after we filed the appeal, the state filed a motion to terminate my client's parental rights. And we proceeded on that motion shortly thereafter. The trial court actually not only went through the dispositional, but thereafter terminated my client's parental rights. They used the two prong tests. First of all, they found that she was unfit. And then secondly, they found that it was in the best interest of the child to terminate her parental rights. We filed an appeal of that termination, and the cases were consolidated because the dispositional appeal was still pending and the termination appeal was pending. So they were consolidated, put together, and this court basically said the trial court did everything correctly with regard to the dispositional stage. However, this court said that in the termination stage, that two prong test, the trial court was right with regard to the unfitness. But this court said that there was insufficient evidence presented to show that it was in the child's best interest to terminate my client's parental rights. So the case went back to the trial court. But Judge Swarm heard the first termination hearing, is that right? And now it's Judge Lawley on this. I believe that is correct, Your Honor, yes. In any event, so we're back to the trial court level, and the trial court has the case. That would have been at the end of 2011, as I recall. That's correct. This court basically found that the termination should be reversed. At that stage, when this court entered the order, part of the order indicated this. Evidence revealed that Penny had provided food, shelter, health care, and clothing for the minor child. The child's identity and family ties were dependent upon her connection to Penny, who was the only remaining interested relative. Keep in mind that she was the adoptive mother, but she was also the grandmother of this child. She'd been with this child or in this child's life since the child's birth. The court also said that there was a bonding assessment by Dr. Shostma that was presented by us, and it revealed that Penny and the child were well bonded, loved each other, and the child wanted to return home to Penny. So at that time, at the end of 2011, that's what this court indicated in part of its findings. It also said a few other things, though, at the time. Unless Penny complies with the goals of the DCFS service plan and demonstrates that she can care for the child, then the child's need for permanence is still not being met. And this court went a step further and said, we're admonishing Penny that she's got to comply with the DCFS service plan goals. Her lack of trust notwithstanding, or she'll most likely face future termination proceedings. Keep in mind that we're back to the trial court level, and the issue at that point, if there is one brought up, is whether or not it's in the best interest of the child to terminate her rights. Well, less than seven months passed when the state did in fact file a motion for a best interest hearing. So they were bringing him back out. The hearing on that motion was held in November of 2012, less than a year after this court actually reversed the trial court's termination order. There are a few things that I think are important that this court know and consider as far as what happened between this court's order reversing the termination and what happened up until the time that the termination was heard again on best interest. First of all, I think it's important that this court know that my client on her own filed an administrative appeal of the service plan. She felt like the service plan really didn't, it wasn't relevant to the facts of her case. It requested items of her and actions of hers that really didn't make sense to her. So she appealed. In April of 2012, she received the order from the administrative courts saying, you don't have standing to appeal this service plan because your rights were terminated. Well, in April of 2012, her rights weren't terminated because the ruling had been reversed. The trial court ruling had been reversed by this court. No, we did tell her to cooperate with DCFS. Absolutely. She had distrust for DCFS, who then provided a non-affiliated DCFS provider, and she refused to cooperate with that provider. Is that correct? I don't believe that she refused to comply with a non-affiliated provider. I think that this court suggested that… What did she do with the non-affiliated provider? Did she have visitation? Did she go and get evaluated? What did she do? Your Honor, I'm not sure if I understand, but I think I do. DCFS had a contract agency, Camelot, but that agency was involved pretty well throughout the snap. She didn't like them, and for good cause. If you look in the record, you will find that this agency did things like accuse her of sexual exploitation of the child. I wasn't involved at that time, but my client appealed that indicated finding that these folks were saying about her. Those things all happened before last time you were at this court. You're exactly right. And this court, in the order reversing, said, quote, Did she do that? I agree with you, Your Honor, and I believe that she did. My question is, did she do that when she went back? I believe that she did comply with the service plan goals. Now, let me qualify that. Did she go to Camelot and say, I'll do everything you say. You can come into my home. You can make me go to your psychologist. Did she meet with anybody from Camelot? She did not meet with anyone from Camelot except at a group setting at the courthouse in Fayette County. With her attorney present who spoke on her behalf. She basically refused to even have a conversation with him the way I read it in the briefs. Your Honor, to a certain extent, that is true. She didn't want any contact with Camelot. And I, as her counsel, as you can see in the record, had to suggest that she have an active role in that meeting. But you have to understand what I argued the last time. It's because she didn't trust him. Just like I said, one example. And that's probably why this order said her trust notwithstanding. Because I think she was justified in not trusting them. And I think that this court at the time was thinking, you know, it's the goals of the service plan that's important. Not necessarily that she has to jump every coop of DCFS or Camelot. But that she has to reach the goals of her plan by that service plan. Did she suggest a provider that she would be willing to cooperate with? I don't believe she suggested a particular one. Well, you know what, I'll qualify that a little bit. We were going to attempt to get a psychological evaluation of the minor child. And at one point, we even said we'd use a DCFS provider. I think that's in the record through different motions. Ultimately, nobody would do it for her. She didn't have any money. And the County of Fayette was going to do it. Didn't the court say it would be free? It would be paid for? No? Am I wrong on that? No. The county was going to pay a certain fee. Initially, it wasn't going to be enough for any provider that we could find. She was basically willing to go to almost anyone as long as they weren't on the side of DCFS. But at one point, we even ended up saying, okay, if this provider has done some work for DCFS, fine. As long as they're not involved in this case. Ultimately, it didn't work. We couldn't find anyone who would do it. So the state wasn't going to get the psychological or wasn't going to use it. And the court said that we couldn't get one either. But I don't know that that part is necessarily as important as the fact that she did make a lot of effort. First of all, because she had this difficulty finding someone to actually do a psychological of the child, that didn't take place. But Penny went out and found her own psychologist who did an assessment on her. The court didn't like it too well. It sounded like the court was saying it wasn't your typical assessment. It didn't have the NMPI and all of those types of testing in it. But Penny did provide him with documents from this case. And she also worked with him for two months so that he got to know her. That was presented in his case. Also, she tried to get a home study, and she even contacted DCFS to try and get that home study. But it was a different DCFS office. She just didn't trust Camelot primarily, so she didn't want them involved. And I could go through all the reasons why she didn't trust Camelot, but I went through that before, and it's all in the record. And it was presented to the trial court. And I think even this court acknowledged that maybe she had a reason. If the court wasn't thinking that, then the court at least acknowledged that she didn't trust them. So this court said comply with those goals of the service plan. So she went out and she got an assessment. She worked with the psychologist for a couple of months, got that assessment. She tried to get a home study by contacting DCFS several times. That was undervoted. She contacted Ligon Family Services. She contacted the local sheriff's department. She contacted the local probation department. She even contacted Catholic Charities. She really made an effort to get that home study, that home evaluation. It didn't end up happening, but it wasn't for lack of making an effort at it. Another thing she did was, and her testimony was unrebutted, she moved away from her husband. She obtained her own home, four bedrooms, two bath homes in Beecher City where she lived with just her dog. So her husband was no longer in the picture. In fact, he had moved to another state. And his name wasn't on the lease, and he wasn't allowed in the property. So she separated from him. She would have divorced him. She testified to that. She just didn't have money at the time. But she removed herself from the person who had allegedly caused the abuse. She contacted the state guard in hopes of getting some guidance. She actually talked to this woman over the phone and tried to get some direction. She tried to arrange visitation with her child. In fact, I believe that she had me send about eight letters to Camelot trying to arrange for a visitation. Keep in mind this was the period after this court had reversed the trial court and before we actually went to hearing on the second round. Was there ever any response to your letters to Camelot, or were you just stonewalled? I remember one response, and the response, I'm not sure if it was in writing or not, but it was, the trial court said you couldn't have telephone contact, so we're not going to have you have visitation. I mean, Penny was at a loss. She didn't know what to do. She wanted visitation with her child. She hadn't seen her child for quite some time, and she was dependent on me to do something. So I kept writing letters. Those are all in the record. And then finally when we threw up our hands and knew that the letters weren't going to work, we actually filed a motion for visitation and for telephone contact. The court heard that motion and said we couldn't have telephone contact but didn't even address the issue of visitation at the time. The bottom line is she did not get any visitation from the time that your order was entered until now, at least until I suppose I can say until we filed the motion in this case, the appeal. The trial court found that it was in the best interest of the minor child for Penny's parental rights to be terminated. That was the second time. And it's from that ruling that we're appealing at this time. It's our position that the trial court order was against the manifest way to the evidence. There were several factors in the statute that the court is supposed to look at when determining whether or not it's in the best interest of the child, determining parental rights. And I had a real problem with that simply because what was Penny to do? They shut her out of this child's life completely. They wouldn't let her see the child. They wouldn't let her talk to the child. She had a hard time finding out where the child was even located. But even with that being said, I want to go through those factors just briefly. The first one is the physical safety and welfare of the child, including food, shelter, health, and clothing. This court made some findings in that respect and indicated that she had provided food, shelter, health care, and clothing. But going a step further, she got a different place to live. She signed a lease. It was separate from her husband. She separated from him. That was uncontradicted. She could, in fact, provide physical safety for the child as well as food, shelter, health, and clothing. The second one is development of the child's identity. Keep in mind that Penny is the only biological relative that has shown any interest in this child whatsoever. She's shown a lot of interest. This is the third appeal. She wants this child. This is her child. This is her granddaughter and her daughter. She's been there since the child's birth. They've had a close bond. The record showed that very clearly. The child could depend on Penny. Never was there another more consistent person in the child's life. And even Dr. Shostma said that Penny was the only continuous attachment figure. I think when we talk about the development of the child's identity, we have to also observe what DCFS did or did not do to develop the child's identity. They said things to the child such as, Penny's lost you forever. You can call your foster mom's mom. They refused visitation. They refused telephone contact. And when I say that they told this child that she could call these foster parents' mom, I want you to keep in mind that the record indicates that in a two-year stretch, this child was in as many as 18 different placements. That's correct. And so statements like, you know, your mom's lost you forever or whatever, at least at that point in time, it was the status of the case. You're right, but I think those statements were made prior to that termination. The third issue, the child's background and ties, including family, cultural, and religious. All of these are connected to the only relative, the only biological relative that this child has. Penny has been a part of this child's world. These new folks, I don't know if they're going to adopt or not, but there's no evidence that they have a cultural or religious tie of any sort with this child.  Again, Penny's been the only continuous attachment figure. They've had a loving relationship all along, and even the trial court found that the child loves Penny and that they're bonded. It's not fair if we say, oh, but she doesn't have much of an attachment now. Well, that's because of her fault? Well, I guess it depends on how you look at it, but she couldn't even get visitation or telephone contact. It's not fair to fault her in that respect. The child's wishes and the long-term goals. Penny said in her testimony that the child wanted to return home to her. We don't know what the child wants for certain now, but we do know that there's been some indication that these new folks have been talking to the child about an adoption. Again, Penny's been shut out of the situation, so to look at what's happened recently is unfair to her. The child's community ties, church, school, and friends. While when the child was with Penny, she had all of those types of ties. Even Penny's current landlord is a friend and a relative. Seven, the child's need for permanent stability, continuity of relationship, and parent figures, siblings, and other relatives. Penny can offer all of that. She's been the one person who has consistently been there and fought for this child. She's established a life where she can provide for the child and the safety of the child and stability. Number eight is uniqueness of every family and child. The uniqueness here isn't the biological part, perhaps. Is it that they've been in each other's lives since the child's birth? I think that's part of it. It's also unique that she's the grandmother and the mother. This child looks like Penny, the testimony indicated. This child was always grandma's girl. No other person played that consistent role in the child's life. Number nine is the risk of substitute care. And I have to admit, in this case, it's not just risks. They actually occur. The instability was forced upon this child in being in up to 18 different placements in less than two years. There was physical abuse in one foster care. She was grabbed by the neck, hit by a stick. Allegations of sexual abuse came up, and there was even a threat to kill the child. That's all in the transcripts. Even in the current placement, there's been some allegation of inappropriate sexual activity. So there's not just a risk of harm. There have actually been occasions of harm in this child's life while the child's been in placement. There's no risk of harm now with the child. All right, thank you. You'll have an opportunity for rebuttal. Thank you. All right, we'll proceed. At this point in the proceedings, the focus has shifted to the child, to MBH. This court affirmed Penny's unfitness, and now we are at the stage of best interest. And the focus changes. It shifts from Penny to what's in the best interest of MBH. And to understand that, we talk about MBH a little bit. Sorry, the fan was a little loud. Talk about what? We need to talk about MBH. The focus has shifted to her best interest. And in order to understand that, we need to understand something about MBH. She is a special needs child. She has behavior problems that are severe, which is she acts out in this way. She steals. She hoards food. She has tantrums. She's destructive of property. And she also acts out sexually. Now, she has a counselor. She goes to individual counseling and counseling with the Trombos as family. And she has been showing improvement. When she first came to the Trombos, she kicked holes in the wall. She got up in the night and was nude in the foster son's bedroom. She also asked another child if he wanted her to perform a sexual act on him. So she acts out sexually. She requires a great deal of work with, counseling, supervision. And the Trombos have done that for her, the foster placement she's in now. They've even installed a surveillance system so that if she gets up in the night, it rings a bell if she comes out of her bedroom. So they can get some sleep but, at the same time, supervise her. There are certain factors that the court is supposed to consider in a just interest hearing. And I think those were set out in Helen's brief and discussed. How does Penny get a fair chance at presenting evidence on those factors when she's given zero contact with the child for nearly a year? Or it's longer than that. Oh, it's longer than that. After our reversal. But after this court… Here's how it is. Please finish my question. How can she get a fair opportunity to present evidence on those factors when, after this court reversed, saying that the state had failed to prove, the state then withholds the child and allows her to have zero contact with the child? How's that fair? Okay. This court found that Penny had completely, deliberately refused to cooperate with service plans. And that didn't change after renamed. Let me ask you. You can answer that. And then I'm going to ask you a question about what happened when renamed. So why she can't give more persuasive evidence on this, it's entirely her fault. Because she grabbed up the child in March of 2010 at a visit in McDonald's. And she ran through the restaurant screaming that people were trying to kidnap the child. And after that, then… Those are all things that occurred before this court's decision. Yeah, I know. But you were asking why. And it goes to why… Well, I'm saying, you know, after this court determined that the state had failed to prove, but it would have to prove to terminate her parental rights and invest in her security, how can it be, then, that the state, on the remake, can prevent her from, you know, having any opportunity to show that she can take care of the child and then seven or eight months later have a best interest hearing? How can that be a reasonable way to deal with this? I'm trying to explain why. You're saying the state can just decide on its own that we're not going to let her have any contact and we'll call up the hearing when we want to, and she can't produce any evidence about any favorable relationship with the child because the state hasn't let her get near the child. Generally, after a finding of unfitness, which was affirmed by this court, visitation is not resumed. And before this court affirmed the finding of unfitness, she did not have visitation. She did not have visitation because of her actions. She was permitted to have visitation after the March incident in 2010, but she refused to go to visitation at the office. And that was the only place where it could be safely conducted due to Penny's behavior. And she is the one who refused to have visitation up until the point of the finding of unfitness. After that point, she had no right to visitation. However, after the reversal by this court, the evidence of record reveals that there were multiple requests for visitation. She wasn't even allowed supervised visitation. She wasn't even allowed to go someplace where 10 people were watching her every move. She got zero contact with the child, including telephone contact. Because the finding of unfitness was upheld, and therefore she was not entitled to visitation now. Let me ask you, when this was remanded to the trial court, were there hearings held for the whole year after we sent it back? Hearings before the trial court where the trial court would admonish her and say, you have to cooperate. If you don't cooperate, you're probably going to face termination again. Or did the trial court just let DCFS run the show? There were status hearings. I can't remember the dates. And would the record show that the trial court continued to admonish her that if she refused to cooperate, termination would proceed? The court in its order terminating parental rights states that there had been continuing admonitions and also cited this court's admonitions to Penny to comply with the service plans or risk termination. Now, at the meeting, it was a group meeting on February in 2012. Penny was there. She wouldn't come in at first. Her attorney had to counsel her to come in. She came in for the meeting and sat down. They went through the service plan line by line and all the goals. And at every one, she shook her head no. And she then also told the caseworker that she could not speak to her. And counsel at that meeting also admonished the caseworker that she was not to contact Penny directly but could only go through counsel. So at the unfitness hearing itself, Penny testified that she in the past had not and that she in the future would not comply with any service plan. She also testified that she thought she and her husband were innocent and that the adjudication was wrong. So she persists in this. And why is this pertinent? It's pertinent because Penny, because MPH is a special needs child. She's going to need a lot more counseling. Her problems are improving. But whoever has custody of her is going to have to cooperate with this counseling. And Penny's behavior from September 9th, when the child was removed, up until this present moment, has been that she will not cooperate with the service plan. She won't cooperate with DCFS, who is providing counseling to MPH. And that is vital proof that she has no ability to meet that first standard, the physical safety and welfare of MPH. She's not going to cooperate with this child's special needs for counseling. She's not going to cooperate. What were you receiving when the trial court said, I found you somebody other than a DCFS provider for you to consult with? The court found that that was a bogus claim. How soon was it, my question? Was it right after we sent it back? The trial court said, okay, I understand you don't trust DCFS, so I'm going to find you and pay for a separate provider. How soon was that? I don't recall that. I'm sorry. Was there any effort ever to do that by DCFS, with this entire record of the problem being not with DCFS per se, but with the agent that DCFS was supposed to be providing services through? Was there ever any effort, any suggestion that a different type of provider be supplied so that the service plan could actually become into an effect, or did DCFS just stay with this service provider and in effect guarantee that there would be no progress? You know, Your Honor, I cannot give you the dates and the times. The court's order. No, I don't expect you to memorize dates and times in this record. The court's order indicated that she was offered the services of an evaluator that was not connected with DCFS. Who that evaluator was, I don't recall. But she was offered that. But the focus is not on Penny and whether she could attain fitness. The focus is now on MDH, and the fact is Penny, up until this very moment, refuses to comply with the service plan in that some indication she's not going to continue, would not cooperate with the counseling services that the child is getting now for her problems. And so for that reason, the court's correct to find that weighing Penny's lack of cooperation against the fact that the Trombos have provided a home where they are willing to now. The question, though, is is it in the child's best interest that Penny's parental rights be terminated? So, yes, the focus is on the child. But the point is how can the court make a reasonable determination of that when Penny's been denied any contact whatsoever with the child? On this one, the court can make that determination looking at Penny's absolute insistence that she will not comply with any service plan. If you're looking at everything that happened before this court's previous order, we reversed the order based on that evidence. But the Trombos weren't in the picture then. There wasn't someone. Right. In other words, the order's based all on things that happened after the appellate court's order, okay? Yet during that time frame, she's given no contact with the child at all. Because her finding of a witness was upheld by this court, she was not entitled to the right to- But then why do we even need to send it back for another hearing if- I think we should have. Yeah, I mean, why do we need to send it back if everything's already been decided? Why would we even reverse the message? You know, I suppose, theoretically, at the point that this court reversed, she was found unfit, and that was upheld. And I suppose that upon remand, if she had obeyed this court's directive and the admonitions of the court below, and if she had started to cooperate somehow, even to have an evaluation, then, you know, I had shown some capacity to grasp MDH's problems and her needs for counseling, then perhaps the result would have been weighed differently. But there was nothing. There was absolute stonewalling all the way from remand on. She will not cooperate. She will not. And the Trombos have had the child at the time of the termination hearing, the best interest hearing, they had had the child for a year, and she was improving. They were dealing with her problems. She had an individual education plan, and they were cooperating with the school. She was being nurtured. But by contrast, there's Penny, who is doing nothing but continue to stonewall. And that's the picture where it was. And she had some time. It's not like there was an immediate call for another best interest hearing. She had some time. There was an immediate request for visitation. I think the record reflects the first letter from Ms. Orr that went out in the days after this court's decision came down. And so who was stonewalling on that? It's in response to Penny's stonewalling that she doesn't have visitation. She will not go to visitation at a place where visits could be safely held. Was she offered visitation at a place where it could be held after this court's decision? I don't believe so. But if they had made that offer, there is no indication in the record that she would have agreed to visitation at the office because she had already, from March 2010, refused to go to visitation at the office. So, I mean, the burden here, after a woman has been found unfit, after this person has been found unfit, the burden is on her to show something, not the people at this point. And the only evidence of the abuse was the grandfather, her husband, not her. She never was accused of any abuse of this child. It was her husband, correct? She, it was her husband, I believe it was a handprint on the child's face where she had been hit. And, but she refused, she refused, even at this unfitness hearing, I mean at this best interest hearing, she continued to insist that she and her husband were innocent. So she doesn't recognize that there was a problem. Now, although the husband may be out of the home, they're not divorced. And with that attitude, there's no guarantee that the husband won't be coming back into that home. Because she doesn't think they did any, that they were, her words, that they were innocent and the evidence of the judicatory hearing was wrong, she says. So, providing, you know, the fact that she has a home and a dog and a yard, that doesn't even begin to approach addressing the needs that MPH has. And she has profoundness. But as far as the development of the child's identity, at this point in time, she calls the Trombos mom and dad and she has an affection for them and they have an affection for her. She sees herself as the Trombos daughter. She's in that family. They're in the process of adopting Will and they are, they said, Wanda Trombo testified multiple times at the best interest hearing that they love MPH, they want her and they would love to adopt her and they intend to adopt her. I don't know how much plain their intent can be. But her sense of attachments are to the Trombos extended family, to their, the three other children that are grown and out of the house, to the nieces and the nephews and the sisters and to Will, the other foster child, who they are, the Trombos are in the process now or were at the time of the best interest hearing. They were in the process of the adoption of Will. And they, she plays with Will. They play, he even plays dolls with her. They have, you know, some friction, but they've developed into a family unit. She has friends her age there. She has definitely a need for permanence. She apparently, she is such a handful that she has had multiple foster placements since she was removed in 2009. But she's found a home now with Trombos because they are willing to do the hard work that it takes to deal with a child with these profound problems. And they, as I said, they cooperate with DCFS as soon as there is a, as soon as she acts out in a special, but they call them immediately and they counsel with them on how to deal with the problems. She, and they cooperate with the independent education program and they are there on call if MBH has a problem at school. She'll drop everything and go. So, you know, her need for permanence can be met with the Trombos. Thank you, Ms. McCormick. Brief rebuttal, Ms. Warren. Before you start, let me ask you a question. Is there anything in the record that indicates that her reaction or refusals were based on the content of the service plan rather than her bad history of reactions to the agency that DCFS had to deliver the service plan and whatever requirements had to be met as far as having that kind of personnel? I believe her refusal to comply with what DCFS and Camelot were telling her to do was primarily because she distrusted them. Not necessarily that she refused to comply with the terms or refused to comply with the goals of the plan, because otherwise she wouldn't have gone out and gotten her own psychological assessment and she wouldn't have separated from her husband to make sure that safety was taken care of and she wouldn't have called, I don't know, five or ten different places, including DCFS, to try and get the home evaluation. Was there ever any suggestion, proposal, or anything from DCFS to have another provider? Never. A couple of points I'd like to make. I know of absolutely no rule of law that says if you're found to be unfit, you don't get any more visitation, you don't get any telephone contact, you're shut out of the child's life. I don't believe there's anything out there that would indicate that, because if so, and I want to say this respectfully, but if that's the situation, was the order that was entered here, reversing the trial court's decision, just totally worthless? Did it mean absolutely nothing? If that's the right of the state to just say, I don't care that the appellate court said that you were incorrect in terminating her rights, that it wasn't in the best interest of the child necessarily to terminate rights, I don't care that that's the ruling. We could just refuse. We could just shut her out. We also told her to cooperate. You did. But, you know, you told her to cooperate with the goals of the service plan, because you were well aware that there was that difficulty between my client and the contract agency. And I think she did try to comply with the goals. By getting her own assessment, just like I mentioned before, she made efforts to try and comply with those goals. She might not have used their people, but she tried to comply. There was some indication earlier that my client wouldn't have taken visitation at the Camelot office. She did take visitation at the Camelot office before the appeal of the termination proceeding. I was there. I think the transcript shows that. I even sent my secretary a couple of times to be there as well. She had visitation at the agency office, and she would have continued to do so. Did she like it? No, of course not. But she wanted to see her child, so she absolutely would have gone. Just one other quick point. I know the focus here today is on the minor child. It's not the focus on my client and my client's rights. It's on what's fair and just and best for this child. I can tell you that based on the case, based on the facts of the matter, it was not best for this child to have all of the ties severed with the only biological person who had consistently been in her life. It was not best for that to happen. That was not in her best interest. Otherwise, the case wouldn't have been kicked back to the trial court level. So the state was not watching out for the best interests of this child, notwithstanding what my client's rights might have been. This child was attached to her adoptive mother, her grandmother, who had always been there, and they would not allow contact, no matter what she did. Thank you, Your Honor. Thank you both for your briefs and arguments. We're going to take this matter under advisement and render a decision in due course.